and Douglas Edgington. I'm going to give you 15 minutes for the plan and 15 minutes to be shared by the defendants. Mr. Russell, please go ahead. Thank you. Your honors, may it please the court, Joe Russell here in the companion case representing the plaintiffs' appellants, John Ruiz Bueno III and Michael Gay. The predominant issue in this appeal relates to the inhumane conditions of confinement claim as I would term it. The conditions of Mr. Peterson's cell on the morning that he died were described as deplorable, a massive putrid filth. Major Edgington had referenced that it deprived him of basic human dignity and we're talking about feces, vomit, days worth of food trays, conditions that couldn't have existed for 24 hours. Food trays certainly, but when a person dies, they tend to exude. There's a lot of stuff about feces. There's nothing about vomit before that I saw. I mean, that sort of goes with dying. The vomiting? Well, your honor, to that point, there is evidence that earlier in Mr. Peterson's jailing, these conditions existed. So this wasn't a one-time occurrence. It happened at multiple points and multiple deputies had indicated that they viewed the cell in the same, if not worse, conditions. Well, we know that the cell was in a messy condition at the time of the death and the extraction of the body. The video, or the CD, which is in black and white, is really pretty hard to look at. It just looks like it's messy, frankly. You can't really tell beyond that. So we can use the words from the investigation. I get that. But if we back off from that, it seems like this cell got itself in messy conditions by virtue of your client on a regular basis and the evidence seems to suggest that it was cleaned. Now, do you have evidence that says that it wasn't cleaned? Well, the evidence of that is, according to Major Edgington, if the cell was ever cleaned, it would have been logged in the log book. That was the jail's policy. And according to our standard of care expert, that is precisely what happens when someone has to clean a cell that's in that kind of condition. You're saying there's a dispute of fact as to whether it was ever cleaned. Correct. Because even though there is testimony that it was, it wasn't logged. Correct. That's it. And even though some of those people specifically said, as I recall, I looked at one here, if we logged it every time, we wouldn't have had time to do the cleaning. Isn't that Corporal McDowell? Well, correct. But there are several other statements. Sergeant Reddick, for instance, when he was asked at his deposition about, you know, would he log a cell cleaning, he said, more or less, yes. If it's not logged, it's as though it never happened. It's not as if though it never happened. It's never logged. By rule, maybe. Sure. By disciplining. You can't bring a constitutional claim based on the failure to follow a rule about logging. So if you have testimony that was cleaned and you have no controverting testimony that wasn't cleaned, aside from the fact that something wasn't logged, I just, I have trouble figuring out the basis for these inhumane conditions prior to the ultimate demise of the decedent here. Well, we also know that there's one deputy, and that's Deputy Longstreth, who admitted that he disregarded the conditions of the cell, specifically because Mr. Peterson was mentally ill. And there are a couple other deputies who are appellees in this case who also admitted to not doing anything about the conditions of Mr. Peterson's cell. I think the Seventh Circuit's decision in Rice actually provides a sound framework for analyzing the issue in this case, which is there is no dispute that these conditions, in fact, existed. They existed from time to time. Now, there's a dispute over whether people did something about those conditions, and sometimes it's admitted that those conditions, in fact, did exist and were disregarded. But you can't possibly bring a conditions of confinement claim based upon the actions of your client. There's no dispute. He's the one that messed it up. The claim has to be that they didn't come in and clean it up on a timely basis. Correct. And the cases seem to say that filthy cells, even for several days, don't rise to constitutional dimensions. Do you agree with that? Some of the cases. I mean, it is that balancing test between frequency and severity. But just being dirty, when the mess is created by the inmate, you can't win on that, right? I'm sorry. You can't say that there's a constitutional violation with the conditions of the cell in terms of their creation by the inmate. The inmate can't create the condition and then complain about the condition. If the inmate creates the condition, all he can complain about is how long it takes to have somebody else clean it up. Well, yes. That's correct. If he creates the conditions in the first instance... And there's no dispute about that in this case, is there? No. That's correct. But that goes into the Seventh Circuit's decision in Rice, which is talking about were these conditions created as a product of mental illness or not. Well, let's assume that they were created as a condition of mental illness. In other words, the reason he did what he did inside his cell was because of the mental illness that he had. Again, that doesn't excuse the fact that he created the condition. It just means they've got to clean it up. Correct. That's correct, Your Honor. So how does Rice help you on that? Because I don't think they did clean it up. I think there's a question of fact as to whether they cleaned it up or not. And how quickly are you saying and how often are you saying that it had to be cleaned up? There isn't one date. I mean, if we believe what inmate Butler says, who submitted a declaration, inmate Butler says the cell was filthy the entire time he was there and that he saw it cleaned maybe once. And keep in mind, there aren't exactly a ton of witnesses around because you're talking about an isolation cell. But I'm curious. Butler says he saw it cleaned once. How often in these 30 days was Butler even on that cell block? Every day. He was there when Mr. Peterson got there. And he worked every shift for 30 days? No, inmate Butler was the neighboring inmate. Oh, I'm sorry. So he's the neighboring inmate, correct, in the single cell set of isolation cells that were present. And Butler can see into the cell to know that it's cleaned up? He was able to perceive that it smelled poorly. And then the other basis for his observations is these inmates are let out to go out for rec and such from time to time. And there's a common area that's right outside this set of single cells where the inmates are allowed to go into. So, yes, he did have an occasion to actually observe the conditions in Mr. Peterson's cell. Okay, now you said how many people here are on these conditions? I believe there are 52 defendants. You got evidence broken down of each one of the 52 that they saw? That goes into this court's decision in Phillips where general allegations can suffice to establish knowledge sufficient to form a deliberate indifference. That case involved I think it was around 18 defendants. It was admittedly a smaller jail. But here there's evidence just like in that case and in the other cases that we've cited in our brief that these people actually worked around Mr. Peterson. They were conducting security checks. And there's evidence that these conditions existed for the vast majority of the time that Mr. Peterson was jailed. When you say these conditions, we do have cases about filth and dirt and inhumaneness. But do you have any guidance as to how dirty it has to be to be inhumane and which one saw him when? Yeah. Obviously even your prisoner says it was clean once. Correct. And we don't know who was there at what time thereafter. Correct. I mean McDowell has perhaps the most testimony that I saw. Maybe I'm wrong. But he had a good bit about when the mattress was torn up and that sort of thing. Correct. Correct. To get to kind of the first part of your question, Your Honor, targeting the how much is too much, what I would say in this case is the adjectives, I mean it's impossible to put yourself in front of that cell and smell what the people smelled and see what the people saw. And as Your Honor pointed out, the photographs aren't quite as descriptive as some of the language. Captain Crummel with the Columbus Fire Department, who regularly makes runs to this jail, said it was impossible for them to even attempt life-saving measures in the cell because the smell was overwhelming and it was in that bad a condition with stuff everywhere. So in terms of drawing a line, I think the line that the appellees are asking the court to draw here is that the feces has to be caked onto the inmate or something to that effect. I don't think from the cases I've seen that that really comports with the law. It is kind of a judgment call. But suffice it to say that when a cell is in such poor conditions that you can't even provide medical treatment in that cell. And it's described by their own facility commander, who's been in the industry for quite some time, as a mass of putrid filth. That has to cross a line. And I think... What does the record show as to whether that condition was created by virtue of the circumstances of his death or whether that condition was predated when he became in this condition of distress starting at, let's say, 2.30 in the morning? Right. Well, what we know about the evidence from that is that the cell, these conditions, were not a one-day event, right? They happened before. They happened before he was dying. And there's no dispute that they occurred because, you claim, his mental illness caused him to act inappropriately in the cell, right? That's our position, Your Honor. I understand that. So now we're trying to figure out who was there when that should have taken steps to clean that up more quickly than you claim happened and didn't do it. And that's where you seem to refer back to Phillips and to Kretko. And, I mean, they just seem to be deliberately indifferent to that condition. There has to have been some evidence that they knew of the condition at certain times. Well, if the jail's logbook, they log hourly security checks. That's required by Ohio's minimum jail standard. And, again, I don't want to equate deliberate indifference with the violation of a policy. I think it's relevant in terms of credibility to other issues in terms of whether they followed policy. But the jail logbook indicates that these people performed their security checks. Well, these people. Does that mean all 50? Let's say there are 54 and we subtract the 52, the two out of that. So let's just assume. Round it off. We're talking about 50 people here. That means every one of those 50 people was doing a security check during the time that the cell was messy? Well, and to be fair, yeah, 32 of the people are the floor deputies, right? The supervisors were supposed to be performing security checks as well, and I believe there are 14 or so security supervisors who did not perform the security checks. Well, if they didn't perform the security checks, then what makes them liable for the condition of the cell? Well, I would get into Phillips again a little bit on that issue along with Rice because Rice indicated that even though it came out against us, against the plaintiff in that case, that because of the nature of the area, the nature of the single-cell isolation unit where you have high-risk, mentally ill inmates, and every deputy here admitted that if you don't conduct your rounds or security checks, that you're running the risk of inmates living in filth, potentially dying. These are obvious risks in a high-risk area of the jail, and you're simply not doing your duty, that you can still be held liable. And that's not even to address the ministerial exception, which I think we briefed, and I can see I'm running out of time. So unless the court has any more questions, I'd ask that the court reverse the district court's decision for the reasons we've discussed. But in this kind of case, you've got to show your individual defendants had some fault. You can't just lump everybody together. So you sue, let's say, who was the commander of the jail? His title's major? Major Edgington, Your Honor. All right, you sued him. Is there any evidence he was ever there in person and saw these conditions? So that goes into the ministerial exception to qualified immunity in the sense that – and that comes – other than addressing the peculiarities of Kentucky state law? Yeah, you're referring to Hedge Path, Your Honor. There has not been a recent Sixth Circuit decision that's been applied in this context. So why don't we not spend a lot of time in the ministerial exception to answering the question? Oh, I'm sorry, Your Honor. What's the evidence that Major actually was there and saw this? Aside from the ministerial exception, there is no evidence that he directly saw the conditions in Mr. Peterson's cell. Is there any evidence that somebody told him about it? There is no evidence. Aside from the widespread pattern of these people not performing their – the widespread pattern of this cell being in a state of frequent filth, there is no direct evidence that anyone told him. How many people in this jail? How many people in the jail total? I believe opposing counsel would be best suited to answer that question for you. But we're talking about only the isolation area of the cell. We're only talking about isolation. In terms of the head of the jail, this is a big jail, right? Correct, Your Honor. Not a little jail like in Phillips where the inference when you read the case was that everybody would have known everything going on in this little jail. That's true, but we're only talking about one little area of the big jail. We're only talking about the isolation cells. So in some ways it becomes a line drawing. Where does the line get drawn? Is it drawn at 18 people where the knowledge can be imputed or is it drawn at 52? Because we're only talking about the people who worked in that particular portion of the jail. Except for Edgington. Except for Edgington who did not. Or the people with Scots above him even, isn't he? In that, yes. That comes down to the ministerial exception. Anything else? Judges, thank you. You'll have any remaining time for rebuttal. May it please the court. Plaintiffs sued practically every person that worked around Mr. Peterson and a lot of people that didn't. With regard to the 51 defendants in this appeal, 4151, over half of them weren't deposed. So plaintiffs basically just have the allegations of their complaint and that's it as to these people. I'd like to clear up the record with regard to the dirtiness of Mr. Peterson's cell. Before you leave that, there's got to be something else in the record that shows that they were even on duty at some point during the time that he was in custody. There is, Your Honor. The IA report has a chart that indicates when people worked. We believe it's accurate. With regard to the conditions, the conditions, the frequency of cleanings, when Mr. Peterson dirtied his cell, are all set forth in the Appalease brief in case number 4151. Plaintiffs haven't disputed those facts. Deputy Bishop worked 20 days around Mr. Peterson, testified that he did cleanings daily, that he doesn't recall Mr. Peterson's cell ever being filthy. Deputy Montrose, there's no date attributed to it, but said that he saw Mr. Peterson's cell one time and it was immaculate. Deputy Minard, I'm sorry, Sergeant Minard at the time, did a sergeant's inspection of the entire area in mid-August and noticed nothing wrong with the cell. You've got a cleaning on August 14th by Deputy Heberlin and Deputy Wood. You've got a cleaning on August 25th or September 2nd that was also performed by Deputy Heberlin and Deputy Hicks. Those dates you're giving are those things that were logged in, or is that from their testimony? That's from their testimony, which has not been disputed in any way. I would also say this with regard to the IA report. It's unclear who could dispute it other than butlers that it's smelled all the time. Or perhaps the IA investigator who spent six months investigating the matter talked to everyone involved and testified in deposition that he believed cleanings were taking place, they just weren't being logged. Who is that person? Lieutenant DeRico, and that's in his deposition testimony near the end. We cite it in our brief. Then you have the guy as one of the officials who, what is it, at one point he says the cell was gross, and then he says, well, I would have said cluttered. Yes, that's Deputy Spang, who worked two days around Mr. Peterson a few weeks before he died, characterized the cell as gross. He also said in deposition testimony that when he walked to his deposition on a 90-degree day, he considered that gross. I mean, look, I understand the adjectives sound bad, but this court should be concerned with the actual evidence of the conditions in the cell, how they became that way, and the duration for which they existed. And despite plaintiff's attempt to generalize the evidence a little bit and expand and say the vast majority of the time Mr. Peterson's cell was dirty, the evidence indicates the opposite, that when his cell was dirty, it was cleaned. It was found on September 4th in a bad way. We cannot deny that. But as this court already hit on, Mr. Peterson was dying at that time. In that regard, with regard to the conditions on September 4th, there's an affidavit from Deputy Benson who did the ending head count on September 3rd, the night before, and indicated that he saw no problems with Mr. Peterson's cell. Defendant Doug Hahn saw Mr. Peterson's cell on September 2nd and noticed no problems with it. Nurse Aniqua Bryant, who's not a defendant, just a third-party nurse who did her segregation round, saw Mr. Peterson's cell on September 2nd and didn't notice anything. So, you know, Mr. Peterson, unfortunately, a mentally ill man, trashed his own cell. He was responsible for these conditions. So I don't even think it implicates cruel and unusual punishment. I mean, he's not being placed into this cell and then kind of left there in these conditions. He's creating them whenever he feels like, basically, and then the deputies have to address them. You don't dispute the duty on the part of the jail to clean it up within a reasonable period of time, even though the conditions were created by him? Absolutely not. We don't dispute that, Your Honor. He's entitled to a habitable cell. No dispute. You know, even Sheriff Scott, in his deposition, when shown the pictures from September 4th, shook his head, and it's in his testimony, said, yeah, that's a dirty cell. It would have been cleaned. I mean, that's what the deputies have to do. I think the plaintiff makes the argument, and I think it's in the reply brief, that the conditions are so bad it could be deemed to be the policy of the jail not to correct them. Then you wouldn't need to worry about qualified immunity of the individuals. Well, I mean... The county or the jail, I don't know. In Kentucky, it would be the county. The jail's not a separate entity, Your Honor. It might be different. But anyway, the public entity would be liable under that test, if they were so bad that it would be deemed to be the policy. I mean... Like a city that permits a series of shootings and use of excessive force, but knowing about it, they do nothing about it. I think I follow you like a custom Monell-type argument. Yeah. Yeah, I mean, theoretically, that's possible. I just don't think there's any evidence for that. The policy was daily cleanings. There's evidence of daily cleanings. There's evidence of additional cleanings in addition to those daily cleanings. So, I mean, again, the incidents set forth in Appley's brief are accurate, as far as when Mr. Peterson's cell was dirty and when it was cleaned. Plaintiffs attempt to expand those by saying, Hey, deputies said this, deputies said that. They reference the same incidents that Appley's reference, but they just don't specify the people or set out the dates like we do. So it sort of makes it seem like this vast problem when it's really not. Are you saying that the congruence between the two sides is they say it was bad on this day, this day, this day, and you say we cleaned it on this day, this day, this day? That's almost, Your Honor. They don't even say what days it was bad on. They just say it was dirty all the time. We're actually the ones that put evidence into the record of, here's the days it happened. You know, we don't have a burden on summary judgment to disprove every possible hypothetical scenario about when Mr. Peterson dirtied his cell for how long. We produced evidence that cleanings took place. We produced evidence that additional cleanings to the daily cleanings took place. We produced evidence that Mr. Peterson created these conditions. It became incumbent upon plaintiffs to produce evidence showing an issue of fact. The only thing they have is the testimony, or if you want to call it that, from Mr. Butler, that says his cell was dirty all the time. It doesn't specify any dates, any conditions. You know, and I don't want to digress too much, but I've been to that jail many times, Your Honor. It's not a great place like a lot of jails. It does have an odd smell. There's a lot of people living in these cells. There's toilets in the isolation cells. So there's also other inmates that trashed their cells. In fact, we put evidence in the record that Mr. Butler himself flooded his cell, cut himself, did various things, was throwing feces at the window himself. So these things do happen. There's no duty to prevent these things. The duty for the deputies is to address them once they notice them, and that's what happened in this case. I'd also like to – we've talked a lot about conditions, but I'd just like to note one other thing. These 51 people were also sued for medical claims. There's been no dispute about the extensive medical attention Mr. Peterson received throughout his jail stay. He was seen once every two and a half days by a nurse or a doctor. He was seen a dozen times by a nurse. He was put on three-day, ten-minute observation. For the first three days he was in jail, he was seen by three different psychiatrists. So any argument that somehow these deputies are responsible for some sort of deliberate indifference as it relates to medical care is just not supported by the record in any way. Do you read that to be within their appeal? I'm tempted to say no because my view of this case has always been that plaintiffs have kind of conflated these conditions with the medical claims. Oh, his cell was so nasty you had to know something was medically wrong with the guy. I guess to directly answer Your Honor, maybe. Yes, I do think that's there a little bit, but they don't dispute the medical care at all. And so despite sort of saying in a general sense these defendants failed something related to Mr. Peterson's medical care, I don't think it's supported in any way in this case and I don't think they really support it properly on appeal. I would also say that the IA investigation, the fact that these defendants were involved in an internal affairs investigation alone has nothing to do with deliberate indifference. This court has hit on it with the individualized inquiry. What did these people see, observe, what did they know about, what did they ignore, if anything? The IA investigation had nothing to do with medical care. Lt. DiRico testified that cleanings took place, they just weren't logged. His main gripe, Lt. DiRico's, was the manner in which people performed their rounds. I don't want to misstate, but I thought I heard plaintiff's counsel say people weren't doing their rounds. That's not what Lt. DiRico says. He took issue with whether some people, not all of them, were going in the common area for their rounds. Nothing more. So to try to say that no one was doing their job for the entire month Mr. Peterson was at FCCC2 is nonsense. That's just not true. How big a jail is this? It's around, average daily, around 1,200, and it can be more depending on what's going on. With regard to these isolation cells, counsel says, well, these are isolation cells. There's actually a vestibule that's between two areas. One side is eight or ten isolation cells with one inmate apiece. The other side is a dorm isolation unit with 25 or 30 guys. The deputies that are at these posts are responsible for multiple ranges. So that's just one area that they would be responsible for. I'd also like to briefly touch on supervisory liability. I think this court already hit it. There's no respondee at superior liability under the Constitution. You can't say, hey, you were the supervisor on duty at this time, therefore there's an issue as to you. They have to knowingly participate, acquiesce in it,  The only supervisors where there's evidence that they noticed something wrong with Mr. Peterson's cell are Corporal McDowell, Sergeant Batchelder, and Corporal Johnson, who were all present on August 27th when the cell was cleaned. That's another problem I've had with this. There's been no delineation by the plaintiffs between defendants they think ignored a cell condition and defendants who actually noticed it and cleaned it. I think without that evidence, their claims fail. They can't just point to the conditions themselves and say those conditions were bad. They existed on X day or Y day. Your statement about the 27th, is that the dates that is pretty much covered in McDowell's deposition? That's correct, Your Honor. Corporal McDowell. Earlier the court said he. It's actually she, Christine McDowell. Sorry. Let me ask you one thing about the procedures here. We talked about Butler's declarations. It looked to me as though there's two declarations, one of which was submitted or dated as of February of 2014, the second one, which is just handwritten, was July 14th. What was the timing of the various motions and decisions? That is, did one of these come in after? The later one, the July one, was filed, was procured and filed right, I believe, right before plaintiff's memo contra to our motion for summary judgment. So they were both, though, before the district judge, before his first effort at ruling? That's correct, Your Honor. Yes. All right. We'll hear from Mr. Edgington. Thank you. Ernie? Thank you. May it please the court, my name is Aaron Glasgow. I'm here on behalf of Douglas Edgington. I feel like the prior argument and your questions and Mr. Sheets have largely stolen my thunder, so I think I can probably take up my three minutes by answering the single question that you, Judge Bortlesman, and you, Judge McKee, ask, which is what did Doug Edgington know about anything? And the answer is nothing. There is no evidence that he knew anything about Mr. Peterson's condition, about Mr. Peterson's cell conditions, about what rounds were being done or what was happening with Mr. Peterson. On a larger scale, there was no, there's no evidence that Mr. Edgington was aware of any kind of problem beyond Mr. Peterson that was going on with rounds not being done or cell conditions not being cleaned. So, you know, the standard here is, you know, based on his knowledge, and there's just no evidence that he was aware of any problem. Edgington is over the whole 1,200 person jail? Yes, he is. Yeah, he's the jail commander, but his testimony is that basically he's the head administrator. He has no day-to-day duties to even inspect, although I'm sure it's good practice for him to walk around for morale, but there's no requirement that he go around and inspect any particular portion of the jail on any particular routine. Actually, he covers things as much as, you know, PR, liaison with the sheriff, which is in a separate place, you know, personnel decisions, staffing decisions, budgeting. He is a true administrator. If I understand counsel's comments correctly, basically he has conceded there is no evidence about Mr. Peterson's knowledge, and they've thrown everything onto this ministerial duty idea. I agree with you, Judge McKeague. This was kind of a head-scratcher for me when this came up. I do a fair amount of qualified immunity work, and I had not run into this. I found nothing in the Sixth Circuit that would apply this, and the cases they cite for the ministerial duty are based on state law. I think there's a couple of them. Hedgepath is Kentucky, and I think there's another one that's based on state law. I would say on the case that they do cite, it's Holloman, Exrail, Holloman versus Harland, their own case, 11th District, the real standard for ministerial duty is whether the governmental employee was performing a legitimate job function through means within his power to utilize. So basically it's whether he was doing his job. So even if this were to apply, it wouldn't change the outcome for Mr. Edgington. And actually I would also point out that Judge Frost found that there was no constitutional violation. This is an exception purportedly to qualified immunity, which he didn't even get to. He said there's no constitutional violation on behalf of Edgington and a lot of other people. So that, too, would say that ministerial duty, if this did apply, it wouldn't apply here. So I see I have very little time left. If there's any questions. Anything else? No. Thank you. Okay. Thank you very much. Thank you, Your Honor. Opposing counsel did reference the size of this particular part of the jail. You're only talking about roughly 30 to 35 inmates in this isolation portion of the jail. These individual deputies, these floor deputies worked in that particular part of the jail. We're not talking about the whole 1,200-prisoner system in Franklin County. We're talking about one particular portion of the jail. Each of these 50 people worked only or predominantly in this unit? They worked in this unit. That's correct, during that time period. I said they only. Only. I can't tell you with precision, but when they worked there, most of these people worked on multiple days in this unit. So for that, you have the log sheets or whatever that tell us who worked which day, which is in the IAB report. Correct, Your Honor. Are you bringing a medical care claim against any of these defendants? I think yes is the short answer. Where does that duty arise? The duty arises because in this case, I know we talked about what acute means in the prior appeal. We talked about how. . . This guy was seen by a doctor or a nurse every two days. What additional duty, medically-wise, and let's carve out the five hours preceding his death, do these jailers owe him? To get a doctor. . . You saw doctors on, I forget what the precise number was, approximately 10 occasions over 30 days. The doctors weren't doing anything. If they had gotten them and called. . . What do you mean weren't doing anything? What does that mean? He didn't get a. . . Mr. Peterson never had a physical. He never had. . . In fact, one was scheduled finally, shortly before he died, after he had been in jail for 30 days. So the jailers are responsible for him not being written up for a physical by the medical people? They're the intermediaries that need to get medical attention to get them involved. No, they're not responsible for not giving him a physical. So what medical care did he fail to receive for which any of the jailers are responsible? The jailers were not responsible for providing him with medical care. You just told me that there is a medical care claim you're making against the jailers. Their only duty was to get the medical care for him. I've seen a bunch of these cases where your logic has some import, which is the doctor never sees the guy. The jailer is supposed to see that he's got a problem and refer him to the doctor. But here the doctor is seeing him every two or three days. So what could they have done any more? They would have said, hey, you should see the doctor. The guy says, I saw him on Tuesday, I'm going to see him on Friday. Yes. The only answer to that is to keep getting medical attention for him and raise what they're viewing, the symptoms that they're seeing. What additional medical care did he require that the jailers are responsible for him not having received? Tell me what care and when that he was due it and didn't get it. When they noticed him gaining weight, which would have been at some point obvious. Inmate Butler says that Mr. Peterson couldn't get out of bed. Let's stop right there. So these medical people see him every two or three days, and they don't notice a condition that ends up having been caused by this congestive heart failure. So you're saying that the jailers were responsible for noticing and acting upon a condition that the medical people would have also seen for 30 days and didn't do anything about? Well, they didn't see him all the time, obviously. They saw him every few days. That doesn't help your argument. Understood. Do you have any authority for an argument of this type whatsoever, that the jailers are responsible for noticing and acting upon a condition that the medical people didn't notice and act upon? Do you have a case even remotely similar to this? Only the acute medical illness case. Nothing specifically involving where medical staff was involved. So it has to come down to his final five hours then, basically, right? With medical care? Yes. And the only people that saw him are the two that were not given qualified immunity? At that point in time, yes. And are you saying they also had a duty then toówell, you are saying that they had a duty to summon medical care? Correct. I get that. Okay, I got it. Thank you. Thank you, counsel. The case will be submitted. The clerk may adjourn court.